IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 3, 2025

IN RE LACIE F.

Appeal from the Juvenile Court for Jefferson County
No. 45JC1-2024-JT-6     Dennis "Will" Roach II, Judge

_____

No. E2025-00080-COA-R3-PT

_____

A mother appeals the termination of her parental rights to her child. The juvenile court found clear and convincing evidence of two statutory grounds for termination: abandonment by failure to support and failure to manifest an ability and willingness to assume custody. It also determined by clear and convincing evidence that termination was in the child's best interest. After a thorough review, we agree and affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and JOHN W. MCCLARTY, J., joined.

Samantha Fugate, Knoxville, Tennessee, for the appellant, Audrey C.

Jonathan Skrmetti, Attorney General and Reporter, and Jason R. Trautwein, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

**A.**

Audrey C. ("Mother") and Stephen F. ("Father") are the biological parents of Lacie F., born in 2012. Mother and her child's numerous interactions with the Department of Children's Services began the same year.

After the first referral to DCS, Mother attempted to flee with the child. When located by law enforcement, Mother tested positive for numerous unprescribed drugs. Further investigation revealed more drugs and drug paraphernalia.

Upon a petition to transfer temporary legal custody and for a restraining order, the Juvenile Court of Cocke County placed the child and her older half-brother in the custody of their respective biological fathers. It also ordered the fathers not to allow any unsupervised contact between the children and Mother. The child was later removed from Father's custody when the court learned that he violated the order by allowing Mother unsupervised and overnight visitation. But over the following months, Mother and Father made progress on their permanency plan toward reunification with the child.

The court approved a trial home placement, but the child's return to her biological parents was cut short. She was returned to DCS custody after both parents were granted temporary orders of protection against one another, each with the child listed as protected. Father regained custody of the child approximately one year later. After three more years, Mother petitioned to regain custody as well. According to her, Father struggled with drug dependency, had lost custody multiple times, and was not following the permanency plan. Mother now had "a job, car, and home" and was "ready to accept responsibility of" the child. The court returned the child to her. Not long after, Father passed away.

The child returned to DCS custody for the third time after Mother was jailed and cited for numerous offenses following an arrest for driving under the influence. Mother had refused to get out of her car or take a blood alcohol test, telling law enforcement that "she was acting strange because she was drunk on love for her family, God, etc." The children were picked up from their home late that evening by their youth pastor, who reported conditions indicative of environmental neglect and a recent change in Mother's behavior. The child's half-brother reported feeling unsafe at home "because Mother won't stop drinking" and that she had also taken "some medicine" last week. According to the half-brother, Mother would sometimes leave the home and "tell the children she was leaving forever." Neither child was enrolled in school.

After two years of therapeutic supervised family therapy and visitation, the juvenile court, this time of Jefferson County, suspended all contact between Mother and the children. The children had been "adamantly opposed to visiting with their Mother" since removal. They had made "significant disclosures beyond the petition" and "serious domestic violence allegations" to the court in chambers. According to the guardian ad litem, the child exhibited "severe" reactions to visitations, including "often remain[ing] in the foster mom's vehicle sobbing for some time" and refusing to "meaningfully interact with Mother." In response, Mother's behavior had escalated. The guardian ad litem reported instances of Mother attempting to physically remove the child from the foster mother's vehicle, making allegations that the child was being sex trafficked while "live

2

streaming" visitation, and discussing inappropriate topics relating to sex and abuse with the children.

B.

DCS petitioned to terminate Mother's parental rights to the child.[1]  At trial, the court heard from Mother, the child's foster mother, the child's court-appointed special advocate, the foster care team lead, the foster care case manager, and a social worker who conducted therapeutic supervised visitation.  It also received deposition testimony of two therapists and two psychological professionals who examined Mother.

Much of the testimony focused on the relationship between Mother and the child. The child's advocate testified that the child had expressed concerns about Mother "several times."  When someone mentioned Mother to the child, the child would say that she did not "want to talk about that" and changed the subject "immediately."  The child "[w]ould not talk to [Mother].  She [was] scared.  She [would] get[ ] in a fetal position."  Other professionals had observed similar behavior.  The social worker reported the child would spend visitation "sit[ting] in the floor behind a black armchair the entire time with her fingers in her ears" or "[running] out of the room screaming and crying."  And the case manager reported the child telling Mother "to shut up when she would talk" and repeatedly telling Mother "that she did not want to be with her."  Mother, too, reported instances of the child "hid[ing] in the corner," "refus[ing] to get out of the [foster mother's] vehicle," and screaming and crying.  She complained that "it seems to be a general theme that the kids are able to disrespect me."

Multiple mental health professionals "reported Mother never took responsibility for the bad things which had happened to her children" and failed to accept "that the family had existing problems."  She denied the children's claims that she had physically abused them, denied that the child's half-brother had attempted suicide in her presence, and denied using drugs.  She denied responsibility for the child coming into DCS custody.  She accused DCS of trying to get the children "on their side" and "letting [the] children make every choice in the case."  Mother's "insight into her situation" and "prognosis for effective parenting" were "low."

Mother testified that she and the children "definitely all got along" before the case, but "being separated for this amount of time and the things that have been said have definitely caused a lot of chaos between" her and the children.  She explained that previous custodial episodes had occurred because she "was trying to leave a domestic violence

---

[1] Initially DCS sought to terminate Mother's parental rights to the child's half-brother as well, but it later voluntarily dismissed that claim.  According to DCS, the half-brother's "situation is unique and distinguishable" as DCS was "not pursing a termination petition against [that child's] father."

3

situation, and it was, you know, the cycles of abuse" or because Father "was starting trouble to try to prevent [her] from being able to stay in the home." Father had taken out the order of protection against Mother "just so he could gain custody of the house and the child, and to remove [Mother]." And "he baited [her]" into violating that order. In Mother's view, the child was only now in DCS custody because of "a misunderstanding as far as [Mother being] . . . under the influence . . . that was later proven to be, you know, untrue."

Mother believed that "the other adults on this case should definitely be held accountable" for the child's resistance to reunification. She felt that they were allowing the child to dictate what happened and that this was tantamount to a failure to follow court orders. She had once called the police to report that the foster mother and professionals "were not allowing" visitation when the child refused to leave the foster mother's car. And she complained that the therapies provided by multiple professionals were not truly therapeutic because "they didn't have an action plan." The sessions seemed to be "targeted towards proving a case against [Mother]" instead of reunification. It was as if the therapists were "trying to make [Mother] give up" or "wanted to end the visit[s] as quickly as possible."

Mother explained that she was "healthy, thriving." She had "stayed clean" since 2016. She hypothesized that a drug test taken a few months before the trial showed positives for methamphetamines and amphetamines because "that last screen was by a different agency than [was] used in the past." Mother had "not done any kind of meth, period." She had "show[n] up to everything and do[ne] everything" required to regain custody. And she had taken "responsibility for all of [her] actions and inability to act." DCS was "just not willing to give [her] the kids to be able to parent."

Mother had become gravely concerned that DCS or the foster family was grooming the child for sex trafficking. During her long separation from the child, the child's appearance had changed. And the child's behavior toward Mother now seemed "very robotic and rehearsed and coerced." She and her half-brother would not eat food that Mother brought to visitation or take anything that Mother tried to give them. Mother believed that the children were not "speaking for theirsel[ves] at all."

Mother was concerned about the foster mother's behavior as well. As a result of having "stalked" the foster mother online, she had found images of the foster mother drinking alcohol. This was "a very big no-no" for Mother. And Mother was unconvinced of the necessity of a tonsillectomy recommended for the child while in the foster family's custody. Several professionals testified that Mother spoke about a belief that the tonsillectomy was going "to be done to increase [the child's] chances of being trafficked" and "used for oral sex." Mother had also opposed the child going on vacation with the foster family based on a fear that foster family would run away with or traffic the child.

4

The foster mother testified that she had called the police during visitations when Mother demonstrated "erratic behavior" to the extent that the foster mother did not feel "able to protect the child." Mother had "tr[ied] to forcefully remove the child from [the foster mother's] vehicle," "tr[ied] to force her way into the vehicle," and been "very verbally aggressive while doing so." Once, Mother filmed a video for social media in which she "walk[ed] around the vehicle, telling the people watching the video that [the foster mother] had abducted her child." Mother admitted to making accusations about trafficking and brainwashing on the video "because [she] didn't know what else to do." She "had a court order" for visitation "that was being violated" by the child's refusal to participate.

The social worker explained that the therapeutic visitation center had recommended ending visitation because Mother repeatedly broke facility rules. Mother had "brought up and discussed several inappropriate topics to both of the children," including, but not limited to, "mentions of sex trafficking, about herself and the children," saying that the children were "constantly around drugs, drinking, and partying" with their foster parents, asking about the half-brother's "virginity status," and other sexual topics. She asked the children if their foster parents were abusing or molesting them. Mother was not responsive to redirection to more appropriate topics. Mother felt like the other adults were "trying to make [her] feel guilty for wanting to know that [the children] are safe or asking them direct questions." She did not "feel guilty for [her] mindset or anything [she had] ever said."

The professionals had no concerns that the foster parents were harming the child. The child was "very close with her foster parents." She had "gained weight" and was "much healthier." The foster mother testified that the child was doing well in school and attending weekly therapy. She got along "very well" with her foster brother. The foster family loved the child and intended to adopt her.

The trial court concluded that there was clear and convincing evidence of two grounds for termination of Mother's parental rights to the child. It also determined that termination was in the child's best interest.

**II.**

A parent has a fundamental right, based in both the federal and state constitutions, to the care and custody their child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. The government's interest in the welfare of a child justifies interference with a parent's constitutional rights in certain circumstances. *See* Tenn. Code Ann. § 36-1-113(g) (Supp. 2024).

5

Tennessee Code Annotated § 36-1-113 describes both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). First, parties seeking termination of parental rights must prove the existence of at least one statutory ground for termination. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); Tenn. Code Ann. § 36-1-113(c)(1). If they prove the existence of one or more statutory grounds, they then must prove that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d at 546). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); TENN. R. APP. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

A.

On appeal, Mother disputes only one of the grounds for termination of her parental rights. Still, we "must review the trial court's findings as to each ground for termination . . . regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016).

1. Abandonment by Failure to Support

The trial court found by clear and convincing evidence that Mother abandoned the child by failing to support her. *See* Tenn. Code Ann. § 36-1-113(g)(1). One definition of "abandonment" includes a parent's failure "for a period of four (4) consecutive months immediately preceding the filing of a . . . petition to terminate the parental rights of the parent . . . to make reasonable payments toward the support of the child." *Id.* § 36-1-

102(1)(A)(i)(*a*) (2021).  "Failure to support" includes the failure "to provide monetary support or the failure to provide more than token payments toward the support of the child." *Id.* § 36-1-102(1)(D); *see id.* § 36-1-102(1)(B) (defining "token support" as support that is "insignificant given the parent's means").  "That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant time period."  Tenn. Code Ann. § 36-1-102(1)(D).

Mother does not dispute that she made no child support payments for approximately seven months preceding the petition to terminate her parental rights.  She had voluntarily decided to quit work and school to "take a break from everything" so that she could "sit down and re-address where [she] was in life."  Mother complained that, though she did not pay child support "like directly financially" during this time, she "was offering several types of support at that time," including clothes, food, and visitation.  The children just "didn't want to accept anything."  The trial court concluded that Mother's offers "amount[ed] to no more than mere token support."  We, too, conclude that the evidence is clear and convincing that Mother abandoned the child by failure to support.

2. Failure to Manifest an Ability and Willingness to Assume Custody

The trial court also found that Mother failed to manifest an ability and willingness to assume custody of the child.  *See* Tenn. Code Ann. § 36-1-113(g)(14).  Under this ground, a parent's rights may be terminated if she has "[1] failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody . . . of the child, and [2] placing the child in the [parent's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child."  *Id.* Both the failure-to-manifest and the substantial-harm prongs must be established by clear and convincing evidence.  *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

The first element is satisfied if DCS has proven by clear and convincing evidence that Mother "has failed to manifest either ability or willingness" to personally assume responsibility for the child.  *Id.* at 677.  "Ability focuses on the parent's lifestyle and circumstances."  *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *6 (Tenn. Ct. App. Feb. 8, 2019).  As for willingness, "we look for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018).  Parents demonstrate willingness "by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child."  *Id.*

As for the second element, the statute does not define precisely the circumstances that might pose a risk of "substantial harm" to a child.  *See* Tenn. Code Ann. § 36-1-113(g)(14).  But the risk must come from the child's placement in the parent's legal and physical custody.  *Id.*  And the harm must be "a real hazard or danger that is not minor,

7

trivial, or insignificant" and is "more than a theoretical possibility." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001).

The proof clearly and convincingly shows that Mother failed to demonstrate the ability and willingness to assume custody of the child. She did not see the need to make changes to her conduct. She denied the existence of the issues that led to the child's placement in DCS custody. The entire years-long custodial episode was, in her opinion, "a misunderstanding." She blamed past instances of domestic violence on Father "starting trouble" or "bait[ing]" her. She blamed a drug testing agency for a recent positive drug test. She blamed all "the other adults on this case" for the child's strained relationship with her. She displayed increasingly erratic behavior and made baseless accusations at visitations, and she refused to be redirected when prompted.

The proof also clearly and convincingly shows that placing the child with Mother would pose a significant, non-theoretical risk of harm to the child. There remained concerns about Mother's substance use, and Mother was aggressive and threatening to the child and other adults when they did not comply with her demands. *See In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021) (explaining that "parents with a significant, recent history of substance abuse, mental illness, and/or domestic violence could lead to a conclusion of a risk of substantial harm"). Significantly, the child would refuse to get out of the car or would hide behind furniture at visitation with Mother. She would put her fingers in her ears, tell Mother to "shut up," and scream and cry. *See In re Terry E.*, No. E2020-01572-COA-R3-PT, 2021 WL 3438567, at *10 (Tenn. Ct. App. Aug. 6, 2021) (finding a substantial risk of harm where the child expressed the desire not to return to the parent). Even at trial, Mother refused to acknowledge that her actions may have caused the child psychological stress, instead suggesting that the child may have been coached to act out during the visits.

B.

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). The best interests analysis should consider "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). The focus of this analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d at 499.

Tennessee Code Annotated § 36-1-113(i) lists twenty factors for courts to consider in determining whether termination of parental rights is in the child's best interests. The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella*

*D.*, 531 S.W.3d 662, 681 (Tenn. 2017). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[ ] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535.

The first three best-interest factors emphasize the child's need for stability and continuity. Factors (A) and (B) analyze "the effect a termination of parental rights will have on the child's critical need for stability and continuity of placement . . ." and "the effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition." Tenn. Code Ann. § 36-1-113(i)(1)(A)-(B). Factor (C) looks to whether the parent has demonstrated continuity and stability in meeting the child's basic needs. *Id.* § 36-1-113(i)(1)(C). The trial court found that the child had a "negative relationship with" Mother. She feared Mother. Mother failed to follow therapeutic visitation rules, acted aggressively toward the child and the foster mother, and continued to test positive for drugs. By contrast, the child had stability with her foster family of more than three years, who intended to adopt her. While in the foster family's care, the child attended regular therapy, made good grades, was involved in school and sports, and was at a healthy weight.

The next four factors focus on the child's relationship with the parent. Factors (D) and (E) question whether the parent and the child have or can reasonably create a healthy attachment and whether the parent has used contact with the child to create a positive relationship. *Id.* § 36-1-113(i)(1)(D)-(E). Factors (F) and (G) look to whether the child is fearful of living in the parent's home and whether the parent or parent's home exacerbates the child's experience of trauma. *Id.* § 36-1-113(i)(1)(F)-(G). The court found that Mother and the child did not have a healthy attachment. The child did "not wish to see her mother at all" and feared living in Mother's home. Evidence reflected "violence and substance abuse during periods of time" Mother had custody of the child. Mother's mere presence triggered screaming, crying, and hiding episodes for the child. Mother was provided numerous opportunities to engage in family therapy, therapeutic visitation, and supervised and unsupervised time to cultivate a positive relationship with the child, but she used much of that time to talk about inappropriate topics such as sex trafficking.

On appeal, Mother faults the child for "refus[ing] to participate in any meaningful visits" and DCS for failing to address "behaviors exhibited by the child." But the evidence does not preponderate against any of the court's factual findings concerning the child's relationship with Mother.

Factors (H) and (I) consider the child's significant relationships in the absence of the parent. *Id.* § 36-1-113(i)(1)(H)-(I). The court found that the child was bonded with her foster family. She was "very close" with her foster mother and got along well with the rest of the family as well. They loved her and wanted to adopt her.

The next factors look at whether the parent has made a lasting adjustment to her circumstances such that the child could be safe in her care and whether she has demonstrated a sense of urgency in doing so. *Id.* § 36-1-113(i)(1)(J), (M). They also consider what resources were available to assist the parent in making a lasting change. *Id.* § 36-1-113(i)(1)(K)-(L). The trial court found that DCS provided Mother with at least three family counselors. Multiple professionals encouraged the child to spend time with Mother. When Mother failed to take meaningful advantage of those resources, DCS obtained a psychological evaluation of Mother to determine if other steps could be taken. Evidence reflected that Mother "did not see a need for adjustment or change of any kind on her part." She was unapologetic for her "mindset." She continued to blame the custodial episodes on a "misunderstanding."

In the court's view, almost every factor favored termination. The child had been in DCS custody numerous times. *See id.* § 36-1-113(i)(1)(M). The most recent custodial episode had lasted more than three years. *See id.* The child made disclosures to several mental health professionals regarding emotional abuse, domestic violence, neglect, and substance abuse by Mother. *See id.* § 36-1-113(i)(1)(N)-(O). Mother showed no understanding of the child's basic or specific needs. *See id.* § 36-1-113(i)(1)(P). She had not accepted the need to change her behavior. *See id.* § 36-1-113(i)(1)(Q). For a period of time, she chose to stop working and paying child support. *See id.* § 36-1-113(i)(1)(S). She was eventually arrested for failure to appear on a child support matter. *See id.* Mother repeatedly failed to demonstrate awareness of the children's needs, instead stating "that the children are ready to come home." *See id.* § 36-1-113(i)(1)(T).

The evidence does not preponderate against these findings. The combined weight of the proven facts amounts to clear and convincing evidence that termination is in the child's best interest.

## III.

We affirm the termination of Mother's parental rights. The record contains clear and convincing evidence to support two statutory grounds for termination. We also conclude that termination of Mother's parental rights is in the child's best interest.

_____s/ W. Neal McBrayer_____
W. NEAL MCBRAYER, JUDGE